**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA AND** | § | |
| **THE STATE OF TEXAS ex rel.** | § | |
| **DOUG MOORE, AND DOUGLAS** | § | |
| **MOORE, Individually** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:09-CV-1452-O** |
| | § | |
| **CITY OF DALLAS, TEXAS AND** | § | |
| **SOUTHWEST GENERAL SERVICES** | § | |
| **OF DALLAS, L.L.C.,** | § | |
| | § | |
| **Defendants.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to the order of reference filed February 3, 2011, this case has been referred for pretrial management, including the determination of non-dispositive motions and issuance of findings of fact and recommendations on dispositive motions. Before the Court are *Relator Douglas Moore's Motion for Summary Judgment and Brief in Support* (doc. 79), filed May 17, 2011, and *City of Dallas' Motion for Summary Judgment* (doc. 111), filed July 29, 2011. Based on the relevant filings, evidence, and applicable law, both motions should be **DENIED**.

**I. BACKGROUND**

This is a *qui tam* suit filed by relator Douglas Moore (Plaintiff), a former employee of the City of Dallas (the City), against the City and Southwest General Services of Dallas, L.L.C. (Southwest) for alleged violations of the federal False Claims Act (FCA), the Texas Medicaid Fraud Prevention Act (TMFPA), and the Texas Whistleblower Act (TWA).

The City extended Plaintiff a written offer of employment to work as "Assistant City Auditor III" on October 1, 2008, and assigned him to work in the Fraud, Waste, and Abuse Section of the

City Auditor's Office. (D. App. at 1, 103). His primary responsibilities as a City employee involved investigating fraud, waste, and abuse. (P. App. at 21, 41–42, 113.) He was a certified fraud examiner at the time, and his prior experience included working as a supervisor at TriCenturion, Inc., a Medicare and MediCaid contractor, and with 2 police departments. (D. App. at 1.) He had not received any formal or informal training as a financial auditor and held no professional auditing certifications or designations. (P. App. at 96-114.) City Auditor Craig Kinton (City Auditor) agreed to delay Plaintiff's start date until February 2009. (D. App. at 1, 103.)

In October 2008, the Dallas City Council approved the audit plan for fiscal year 2009. (D. App. at 1.) One of the objectives identified by the plan was "to evaluate controls over accounts receivable and effectiveness of collection processes." (*Id.* at 1-2.) Based on information regarding accounts receivable, Dallas Fire-Rescue (DFR) accounts were selected for audit. (*Id.* at 2.) Given his knowledge and experience, Plaintiff was assigned to the Emergency Ambulance Fees Audit team, which consisted of 3 other members, Harry Krewson, Anatoli Douditski, and Rowena Zhang. (P. App. at 67-68.) Plaintiff was the fraud investigator on the team and the only member with medical billing experience. (*Id.* at 68, 78.) Krewson was Auditor II, Douditski was Auditor II, and Zhang was Auditor III and project manager. (*Id.* at 67-68.)

In March 2009, a focus meeting was held to discuss audit objectives. (*Id.* at 2, 97.) Plaintiff expressed his concern about the City being susceptible to an overpayment based on its billing Medicare and Medicaid for all ambulance transports at the higher Advanced Life Support (ALS) level rather than billing some at that level and some at the Basic Life Support (BLS) level. (D. App. at 2, 97; P. App. at 72-73.) This issue and several others were identified as "Quick Hits", and the City Auditor requested they become a priority. (D. App. 2; P. App. at 73.) It was Plaintiff's

responsibility to determine if the City was billing ambulance transports properly.  (D. App. at 2.)

The audit team wanted to take a sample of cases to evaluate the documentation that DFR "was putting in when they were called out, and to see if they were actually meeting ALS criteria." (D. App. at 90.)  Plaintiff's supervisor, Assistant City Auditor Gary Lewis (Supervisor), believed the audit team needed to sample cases with documentation so they could evaluate the sample documentation against the Medicare criteria.  (*Id.*)  Using statistical software designed by the State Auditor's office called "Toolbox," Zhang and Krewson created a statistical sample of May 2009 ambulance billing records.  (P. App. at 81-82, 94.)  Using the attribute sample method, Zhang and Krewson designed the audit sample by entering the appropriate data, including the population number, confidence level, attribute error and error margin.  (*Id.* at 83-87, 89.)  Out of 1700 records, the software generated a sample of 28 or 29 records.  (*Id.* at 88.)  Zhang later testified that she was satisfied with the sample size, and that the Supervisor and City Auditor never questioned the statistical sample size.  (*Id.* at 91-93.)

After Zhang and Krewson designed the statistical sample, Plaintiff determined that the DFR ALS/BLS sample had a 100% error rate, and he concluded based on the error rate that the City could be liable for an overpayment of $26,990,207.36.  (P. App. at 90, 94-95; D. App. at 99-100, 113.) The Supervisor expressed his discomfort with Plaintiff's findings of a 100% error rate from the ambulance billing samples tested to the City Auditor. (D. App. at 91.)  The Supervisor testified that in his forty years as an auditor, he had never seen a 100% error rate and was concerned because Plaintiff had only been with the office 6 or 7 months.  (*Id.* at 92.)  The City Auditor also learned that Theresa Hampden, Assistant City Auditor and Quality Control Manager on the audit, was concerned about Plaintiff's conclusion of a 100% error rate.  (*Id.* at 2, 83.)

3

The Supervisor testified that Plaintiff met him and discussed the possibility of a *qui tam* lawsuit. (P. App. at 46.) Plaintiff allegedly stated: "we have an overpayment," and "you know, if somebody finds out about this, they will file a *qui tam* suit." (*Id.*) The Supervisor then asked Plaintiff to draft a confidential memorandum to the City Council in order to keep information about the ambulance overpayment issue away from the press record searches. (*Id.* at 43-44, 115.) The City Auditor believed, however, that the issue was not appropriate for a confidential memo because there was nothing in the Texas Open Records Act that would allow the information to be confidential. (D. App. at 2, 83.)

Even though the City Auditor was aware of the potential liability for an overpayment in or around August 2009, he never reported the issue to the Texas Attorney General, Medicaid Fraud Control Unit, or Medicare contractor, and never called the City's billing vendor, Southwest General Services of Dallas, L.L.C. (Southwest), to discuss the issue. (P. App. at 22-24, 27, 29–30.) The City Auditor testified that he could not recall if he informed a member of the Dallas City Council of the improper billing. (*Id.* at 31–34.)

On August 5, 2009, Plaintiff filed a *qui tam* lawsuit under seal individually and on behalf of the United States and the State of Texas, alleging that the City and Southwest had engaged in improper billing practices in violation of the FCA and the TMFPA. (doc. 1.) Plaintiff later testified that he realized in April 2009 that there was a reward involved in being a relator in a False Claims Act case, and that if the reward was 10% of $26 million, that was a significant amount of money. (D. App. at 101–02.)

In November 2009, the audit team was working on a draft of the audit report that included information that the City may be susceptible to Medicare overpayment. (*Id.* at 2, 93, 99.) On

4

November 10, 2009, Plaintiff received a "Fully Successful" performance review from the City, appraised by the Supervisor and reviewed by the City Auditor.  (P. App. at 1–4.)  The City Auditor handwrote on the review that Plaintiff's "knowledge, skills and abilities are valuable assets to this office." (*Id.* at 4.)

Around November 24, 2009, City Attorney Tom Perkins (City Attorney) informed the City Auditor that Plaintiff had filed a *qui tam* lawsuit against the City while still assigned to the audit. (D. App. at 2.)  Former mayor Tom Leppert testified that during his initial meeting with the City Auditor and City Attorney about the issue, the City Auditor "expressed very strongly his frustration, concern, and anger over the ethical breach he saw that took place in his office." (*Id.* at 52.)  The City Auditor advised Leppert that he wanted to terminate Plaintiff, and that he viewed the situation as an incredible breach of ethics.  (D. App. at 54.)  Leppert concurred with his views.  (*Id.* at 54.)

The City was closed from Wednesday, November 25 to Friday 27, 2009, due to the Thanksgiving holiday, as well as during the ensuing weekend. (P. App. at 11–12.)  On December 2, 2009, Plaintiff met with the City Auditor, the Supervisor, and Human Resources Director David Etheridge.  (*Id.* at 35–36.)  During the meeting, the City Auditor informed Plaintiff that his services were no longer needed and provided him with a letter stating that his termination was effective immediately.  (*Id.* at 5.)  The City terminated Plaintiff within 3 business days after the City Auditor learned that he had filed this lawsuit.  (*Id.* at 11–12.)

Plaintiff amended his complaint on January 15, 2010, to add allegations of retaliation under the FCA.  (doc. 10.)  On January 25, 2010, Plaintiff sent a letter to the City Attorney, alleging retaliation under the FCA and TMFPA and providing notice that he was filing a grievance.  (P. App. at 10.)  In a letter dated February 24, 2010, from the Executive Assistant City Attorney, the City

denied the allegations and stated that the grievance process was available only to current City employees.  (*Id.* at 10.)[1]

On March 24, 2010, Plaintiff requested leave to file a second amended complaint to include claims for retaliation under the TMFPA and the Texas Whistleblower Act ("TWA"), and attached the proposed complaint to the motion.  (doc. 11.)  The court granted his request for leave to file the second amended complaint on April 1, 2010, but the order did not specify the date by which Plaintiff had to file the amended complaint, or whether the Clerk of Court had to file the amended complaint.  (doc. 12.)  On August 31, 2010, the court ordered Plaintiff to file his second amended complaint on or before September 3, 2010, by 12:00 PM.  (doc. 19.)  Plaintiff complied with the order, and the Court ordered the docket sheet modified to reflect a filing date of April 1, 2010, for the second amended complaint.  (doc. 20.)  The defendants were served with the summons on September 9, 2010.  (*See* doc. 25.)

Plaintiff now moves for summary judgment in his favor on his retaliation claims under the FCA, the TMFPA, and the TWA.  The City also moves for summary judgment in its favor on the retaliation claims.

---

[1]    The City argues that the second amended complaint served on it on September 9, 2010, is not the second amended complaint on file with the court.  It notes that the pleading on file is 36 pages long and is signed by one of Plaintiff's attorneys, while the pleading served on it is 128 pages long and signed by 2 attorneys.

Plaintiff filed 2 copies of the proposed complaint with his motion for leave to file a second amended complaint. One copy is 24 pages long, signed by 1 attorney, and has 104 pages attached consisting of exhibits A to J.  (*See* docs. 11, 11–1, 11–2, 11–3, 11–4.)  The other is attached to the proposed order granting leave to amend; it is 24 pages long, signed by 2 attorneys, and has 101 pages attached consisting of exhibits A to J.  (*See* docs. 11–4, 11–5, 11–6, 11–7.)  The second amended complaint that Plaintiff eventually filed is 24 pages long, signed by 1 attorney, and has only 12 pages attached consisting of exhibits A and B.  (*See* doc. 20.)  The complaint served on the City is 24 pages long, signed by 2 attorneys, and has 104 pages attached as exhibits A to J.  (*See* doc. 112-3.)  All of the different copies of the actual complaint are identical except for the attorney signatures; the main difference between the copies is the number of attached exhibits.  Although the Court in no way condones the filing of a complaint that is different from the one attached to the motion for leave to amend, or the filing of multiple versions of the complaint that gave rise to the confusion, the City does not explain or cite any authority as to how the discrepancies in signatures and exhibits affects any party's request for relief in the pending motions for summary judgment, especially since it has been on actual notice of the causes of action.

## II.  EVIDENTIARY CONSIDERATIONS

The City moves to strike the evidence attached to Plaintiff's reply to its response to his motion for summary judgment on grounds that the evidence has not been authorized, and that the City did not have an opportunity to further respond to the evidence.

It is well established that a party may not file evidence with a reply brief without first obtaining leave of court.  *Racetrac Petroleum, Inc., v. J.J.'s Fast Stop, Inc.*, 2003 WL 251318, at *19 (N.D. Tex. Feb. 3. 2003) (citing Local Rules 7.1(f) and 56.7).  The purpose of a reply brief is to rebut the non-movant's response and not to introduce new evidence.  *See Springs Indus., Inc. v. American Motorists Ins. Co.*, 137 F.R.D. 238, 239–40 (N.D.Tex.1991) (Fitzwater, J.); *Racetrac Petroleum, Inc., v. J.J.'s Fast Stop, Inc.*, 2003 WL 251318, at *18 (N.D. Tex. Feb. 3. 2003).  When a movant has interjected new evidence into a reply brief without affording the non-movant an opportunity for further response, the court retains the discretion to decline to consider it.  *Spring Indus.*, 137 F.R.D. at 240.  "There will be instances, of course when a movant should not be permitted to cure by way of reply what is in fact a defective motion or when an injustice will otherwise result to a nonmovant if a reply brief is augmented with new evidence."  *Id.*

Here, Plaintiff has filed unauthorized evidence in support of its reply brief.  Because the City had an opportunity to, and did, respond to the arguments and evidence in Plaintiff's reply brief in its cross- motion for a summary judgment and reply brief, the motion to strike the evidence (doc. 104) is therefore **DENIED**.

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(a).  "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id*. The movant makes a showing that there is no genuine issue of material fact by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The pleadings, discovery and disclosure materials on file, and affidavits, if any, must demonstrate that no genuine issue of material fact exists.  Fed. R. Civ. P. 56(c).

Once the movant makes this showing, the non-movant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324.  To carry this burden, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the non-movant must show that the evidence is sufficient to support a resolution of the factual issue in his favor.  *Anderson*, 477 U.S. at 249. While all of the evidence must be viewed in a light most favorable to the motion's opponent, *id*. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)), neither conclusory allegations nor unsubstantiated assertions will satisfy the non-movant's summary judgment burden, *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992).

## IV.  RETALIATION UNDER THE FCA

Plaintiff moves for summary judgment on his FCA retaliation claim on grounds that there is no genuine issue of material fact with respect to any element of the claim.  The City moves for

summary judgment on grounds it had a legitimate non-retaliatory reason for Plaintiff's termination, and that Plaintiff cannot show that the proffered reason is simply a pretext for retaliation.

The FCA "is the government's primary litigation tool for recovering losses sustained as the result of fraud." *U.S. ex rel. Marcy v. Rowan Companies, Inc.*, 520 F.3d 384, 388 (5th Cir. 2008). The FCA may be enforced in suits filed by the Attorney General, or in *qui tam* actions brought by private individuals in the government's name. *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 411–12 (2005) (citing 31 U.S.C. § 3730(a) & (b)(1)). The whistleblower provision of the FCA encourages employees with knowledge of fraud to come forward by prohibiting an employer from harassment, retaliation, or threatening of employees who assist in or bring a *qui tam* action. *See Robertson v. Bell Helicopter Textron. Inc.*, 32 F.3d 948, 951 (5th Cir. 1994) (citing 31 U.S.C. § 3730(h)).

To prevail on an FCA retaliation claim, a plaintiff must show that (1) he engaged in activity protected under the statute; (2) his employer knew he engaged in protected activity; and (3) his employer discharged him because of the protected activity. *See U.S. ex rel. Patton v. Shaw Servs., L.L.C.*, 418 F. App'x. 366, 371–72 (5th Cir. 2011) (citing § 3730(h); *Robertson*, 32 F.3d at 951). To establish the third element of his prima facie case of FCA retaliation, the plaintiff must show that he was terminated, at least in part, because of his protected activity. *See Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002).

If the plaintiff establishes a prima facie case of retaliation, a presumption of retaliation arises. *Scott v. Metropolitan Health Corp.*, 234 F. App'x 341, 346 (6th Cir. 2007); *Kakeh v. United Planning Org., Inc.*, 655 F.Supp.2d 107, 115 (D. D.C. 2009). The burden then shifts to the employer to advance a legitimate, non-retaliatory reason for the adverse employment action. *Id.*; *Hutchins v.*

*Wilentz, Goldman & Spitzer*, 253 F.3d 176, 186 (3d Cir. 2001). "The rebuttal burden is one of production only, and the employer does not have to persuade the court that it was actually motivated by the proffered reason." *U.S. ex rel. Dyson v. Amerigroup Tex., Inc.*, 2005 WL 2467689, at *3 (S.D. Tex. Oct. 6, 2005) (quoting *Texas Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 253-55 (1981).

Once the employer satisfies this burden of production, the plaintiff bears the ultimate burden to show that the employer's stated lawful reason was a pretext for retaliation. *See id.*; *Scott*, 234 F. App'x at 346; *Kakeh*, 655 F. Supp. 2d at 115. To show pretext, the plaintiff "must submit evidence demonstrating that the employer did not honestly believe in the proffered non-retaliatory reason for its adverse employment action." *Scott*, 234 F. App'x at 346 (citation and quotation marks omitted).

## A.  Prima Facie Case

Plaintiff has proffered evidence sufficient for a reasonable jury to conclude that he has established a *prima facie* case of retaliation. First, there is evidence that Plaintiff engaged in protected activity. He determined a 100% error rate from the sample of ambulance billing records, expressed his concern about the City's potential exposure to more than $26 million in false claims, discussed the possibility of filing a *qui tam* action with his supervisor, and did file a *qui tam* action in August 2009. *See U.S. ex rel. Garibaldi v. Orleans Parish Sch. Bd.*, 21 F.Supp. 2d 607, 617 (E.D. La. 1998) (mentioning possible violations of the False Claims Act in the audit report and filing the *qui tam* lawsuit enough to show protected activity). Second, there is evidence that the City knew he had engaged in protected activity by filing a *qui tam suit* against it. Third, there is some evidence to support a conclusion that the City terminated Plaintiff, at least in part, because of his protected activity. The City terminated him on December 2, 2009, within 3 business days of

learning about his *qui tam* lawsuit on November 24, 2009, and after giving him a "Fully Successful" performance review on November 10, 2009. The record also contains testimony by the former City mayor that the City Auditor stated during in their initial meeting about the *qui tam* suit that he wanted to terminate Plaintiff and that he viewed the lawsuit as an incredible breach of ethics. (D. App. at 54.) The City Auditor also reportedly "expressed very strongly his frustration, concern, and anger over the ethical breach he saw that took place in his office." (D. App. at 52.)

## B. Non-Retaliatory Reason

The City has also proffered evidence that could lead a reasonable jury to conclude that it had a legitimate, non-retaliatory reason for Plaintiff's termination. The City offers the City Auditor's declaration that he did not terminate Plaintiff's employment because of the *qui tam* suit. (D. App. at 4.) It also offers his deposition testimony that he discharged Plaintiff because he felt that Plaintiff had breached his fiduciary duty to the City Auditor's Office and had violated government auditing standards and his office's policies and procedures to ensure compliance with those standards. (*Id.* at 84-86.) The City Auditor specifically states that Plaintiff violated his fiduciary responsibility by violating multiple Generally Accepted Government Auditing Standards (GAGAS) as promulgated by the Comptroller General, U.S. Government Accountability Office. (*Id.* at 3, 16-44.) He also states that Plaintiff violated the GAGAS ethical principles when as a member of the audit team, he failed to maintain his integrity, objectivity, and independence in discharging his responsibilities. (*Id.* at 3.) He further states that Plaintiff violated independence standards by creating a significant personal financial interest in the subject of the audit that would lead objective third parties to conclude that he could not maintain his objectivity. (*Id.* at 3, 101, 102.)

The City also offers evidence showing that Plaintiff signed an Office of the City Auditor

annual checklist to ensure independence against personal and external impairments on October 5, 2009, 2 months after he filed the *qui tam* suit using information obtained in his job responsibilities during the Emergency Ambulance Fee audit.  (*Id.* at 2-3, 12-15, 104.)  The document the City presents as an exhibit includes an acknowledgement that the auditor had completed the check list, had neither personal nor external impairments that would affect assignments, would reevaluate his or her independence if assignments or circumstances changed, and would promptly notify the assignment audit manager and complete the attached addendum if his or her independence was affected.  (*Id.*  at 2-3, 12-15.)  Additionally, the City presents evidence showing that on June 16, 2009, Plaintiff signed off on the Independence Statement in the Emergency Ambulance Billing electronic work papers stating "I have no known independence impairment as of the date of this sign-off.  However, I will promptly notify the assignment Audit Manager and complete the required Addendum if needed." (*Id.* at 2-3, 104.)

Finally, the City has attached the City Auditor's declaration and several exhibits to show the following violations of the City Auditor's policies and procedures as reasons for Plaintiff's termination:

(1) Violation of Section 1.4 entitled "Vision, Mission and Statement of Values" when Plaintiff impaired his independence and failed to report this fact.  (*Id.* at 3, 45–48.)

(2) Violation of Section 2.1 entitled "Generally Accepted Government Auditing Standards" including those related to ethics, independence, professional judgment and reporting.  (*Id.* at 3, 49–5 4.)

(3) Violation of Section 2.2 entitled "Ethical Principles" when Plaintiff put his own interest ahead of the City's interest, failed to report his impaired independence and conflict of interest, improperly used the City's and its citizens' sensitive information, and used his position and information obtained through his job duties for personal gain.  (*Id.* at 4, 55–59.)

12

(4) Violation of Section 2.3 entitled "Assessing and Certifying Auditor Independence" when Plaintiff failed to report his impaired independence, falsely certified his independence in audit working papers documentation, and falsely signed annual checklists to ensure independence after he had impaired his independence. (*Id.* at 4, 60-69.)

(5) Violation of Section 6.7 entitled "Release of Official Information and External Contacts Related to the City Auditor's Office" when Plaintiff released information about the audit without the office's approval. (*Id.* at 4,70-74.)

(6) Section 6.9 entitled "Problem Resolution, Gifts, Dress Code and Personal Business" when he failed to bring to the City Auditor's attention to any disagreement or concern that he had with how the ambulance billing audit was being handled, and failed to complete a form to disassociate himself with the audit at issue if he disagreed with how it was being handled. (*Id.* at 4,75-80.)

Since the City has proffered evidence of a legitimate non-retaliatory reason, the burden now shifts back to Plaintiff to present evidence of pretext.

## C. Pretext

Plaintiff contends that the City's proffered reason — that he violated auditing standards and the City Auditor's office policies and procedures — is a pretext for retaliation. He argues that by training, designation, and experience, and contrary to the City's imposed job title, he has never been an "auditor." He points out that the City assigned him to work in the Fraud, Waste, and Abuse Section of the City Auditor's Office (D. App. at 1, 103), and his primary responsibilities involved investigating fraud, waste, and abuse (P. App. at 21, 41–42, 113). He also points out that at the time of his employment, he was a certified fraud examiner, had not received any formal or informal training as a financial auditor, and held no professional auditing certifications or designations. (P. App. at 96-114; D. App. at 1.) Even on the audit team, his role was that of a fraud investigator. (P. App. at 68.) He argues that even if the City's policies or procedures applied to him, they do not trump state or federal law.

13

He also argues that the City ignores the fact that it fired him within days of finding out about the *qui tam* suit, and that he was the only person on the audit team who identified the 100% error rate, brought it to the audit team's attention, and sought to redress the City's billing practices by reporting it to government enforcement agencies.  The City responds that its official policies and the GAGAS professional standards apply to both audit and non-audit services.  (D. App. at 407.)

Based on the evidence presented by each side, there are contested issues of material fact that preclude summary judgment on the FCA retaliation claim.  Specifically, the City's proffered reasons for terminating Plaintiff are all tied to Plaintiff's protected activity, i.e., the filing of the *qui tam* lawsuit.  Whether or not the reasons are legitimate or mere pretext is therefore best left for the jury to decide.  The Fifth Circuit has held that "the combination of suspicious timing with other significant evidence of pretext, can be sufficient to survive summary judgment."  *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999) (Title VII case).

## V.  RETALIATION UNDER THE TMFPA

Plaintiff moves for summary judgment on his TMFPA retaliation claim on the ground that he has produced conclusive evidence of retaliation.  The City moves for summary judgment on grounds that the court does not have jurisdiction over the TMFPA claim because it is time-barred, and that there is no evidence that the City retaliated against him because of protected activity.

### A.  Statute of Limitations

The TMFPA is silent on the statute of limitations applicable to an employment retaliation action.  *See U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709, 709 (N.D. Tex. 2011).  Where, as here, an expressly applicable statute of limitation is absent, the court borrows the most closely analogous state limitations period.  *See id.* (citing *Graham Cnty. Soil & Water*

*Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 419 (2005)).  Even though there is no definitive Fifth Circuit decision on the issue, this district has applied the 180-day limitations period for a hospital whistleblower retaliation action under the TWA to FCA and TMFPA claims alleging retaliation for whistleblowing in the healthcare industry.  *Wall*, 778 F. Supp. 2d at 709.  Since Plaintiff also alleges retaliation for whistleblowing in the healthcare industry, the court will apply the State's 180-day limitations period.[2]

Here, the City terminated Plaintiff on December 2, 2009.  Plaintiff moved for leave to file a second amended complaint alleging retaliation under the TMFPA and TWA on March 24, 2010, and attached the proposed pleading as an exhibit.  The court granted his motion on April 1, 2010, and ordered him on August 31, 2010, to file his second amended complaint by 12:00 PM on September 3, 2010.  Plaintiff timely complied with the order.  Since Plaintiff had attached the proposed complaint to his motion, and the order granting the motion did not specify the date by which Plaintiff had to file the amended complaint, or whether the Clerk of Court was to file the amended complaint, the Court ordered that the docket sheet reflect a filing date of April 1, 2010.  For all intents and purposes, the second amended complaint is deemed to be filed on April 1, 2010, which is within the 180-day limitation period for filing Plaintiff's TMFPA claim.  The claim is therefore not time-barred.

## B.  Merits of the Retaliation Claim

The TMFPA is designed to prevent and remedy fraud against the Medicaid program.  *See* Tex. Hum. Res. Code § 34.001 *et seq*.  The TMFPA, like the FCA, also contains a whistleblower provision that encourages employees with knowledge of Medicaid fraud to come forward by

---

[2] Notably, the City does not object to, but suggests, the 180-day limitations period, and Plaintiff does not dispute it.

prohibiting an employer from retaliating against employees who assist in or bring an action under the TMFPA:

> A person, including am employee, contractor, or agent, who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of a lawful act taken by the person in the furtherance of an action under [the TMFPA], including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under [the TMFPA], or other efforts taken by the person to stop one or more violations of Section 36.002 is entitled to: (1) reinstatement with the same seniority status the person would have had but for the discrimination; and (2) not less than two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

Tex. Hum. Res. Code. § 36.115 (West 2001).

As to the merits of the TMFPA retaliation claim, the parties offer the same evidence and arguments that they offered with respect to Plaintiff's FCA retaliation claim.  Plaintiff argues that the City terminated him for filing a lawsuit under the TMFPA.  The City argues that it has offered a legitimate non-retaliatory reason for its termination decision.  Plaintiff contends that the City's proffered reason is a pretext for its retaliation.  As discussed, based on the evidence and the arguments presented by each party, there are genuine contested issues of material fact that are only appropriate for the jury to decide.  Summary judgment is therefore not appropriate in either party's favor.

## VI.  RETALIATION UNDER THE TWA

Plaintiff moves for summary judgment on his TWA claim on grounds that he has produced conclusive evidence of all the elements of his claim.  The City moves for summary judgment on grounds that the court does not have subject matter jurisdiction over the claim because the claim is time-barred, and that Plaintiff has not offered evidence showing that the City retaliated against him

as a result of making a report to an appropriate law enforcement authority regarding a violation of a law by the City.

## A. Statute of Limitations

The TWA prohibits a governmental entity from terminating or taking any adverse employment action against an employee who in good faith reports to an appropriate law enforcement authority a violation of law by the entity or a public employee of the entity. Tex. Gov't Code § 554.002(a) (West 2004); *Garret v. Judson Indep. Sch. Dist.*, 299 F. App'x 337, 341 (5th Cir. 2008). The statute provides that a public employee seeking relief "must sue not later than the 90th day after the date on which the alleged violation of this chapter: (1) occurred; or (2) was discovered by the employee through reasonable diligence." Tex. Gov. Code Ann. § 554.005. It also provides that the employee "must initiate action under the grievance or appeal procedures of the employing state or local government entity relating to suspension or termination of employment or adverse personnel action before suing under this chapter." Tex. Gov. Code Ann. § 554.006(a). The 90-day limitations period is tolled during the first 60 days the employee is following the grievance procedure. *See* Tex. Gov. Code Ann. § 554.006(c)-(d); *Ray v. Houston Indep. Sch. Dist.*, 2010 WL 2545577, at *2 (S.D. Tex. June 21, 2010); *Dallas Indep. Sch. Dist. v. Barfield*, 2002 WL 1788014 (Tex. App.– Dallas, Aug. 5, 2002).

Here, the 90-day limitations periods began running on December 2, 2009, when Plaintiff's allegedly retaliatory discharge occurred. The period was tolled from January 25, 2010, when Plaintiff filed his grievance with the City to February 24, 2010, when the City responded that the grievance process was not available to him. On April 1, 2010, Plaintiff filed his second amended complaint to include claims for retaliation under the TWA. Plaintiff, therefore, filed his TWA

retaliation claim on or within the 90-day limitations period, and his claim is not time-barred.

## B.  Merits of the Retaliation Claim

In order to establish a claim under the TWA, a plaintiff must show that: (1) he is a public employee; (2) he acted in good faith in making a report; (3) the report involved a violation of law by an agency or employee; (4) the report was made to an appropriate law enforcement authority; and (5) he suffered retaliation as a result of making the report.  *Tharling v. City of Port Lavaca*, 329 F.3d 422, 428 (5th Cir. 2003); *Phelan v. Texas Tech Univ.*, 2008 WL 190741, at *3 (Tex. App.–Amarillo, Jan. 23, 2008, pet. denied).

### 1.  <u>Good Faith Report</u>

As discussed, the first four elements of a TWA claim require a showing that the plaintiff was a public employee and made a good faith report of a violation of law by an agency or employee to an appropriate law enforcement authority.  *Tharling*, 329 F.3d at 428.  The TWA defines law as "a state or federal statute, an ordinance of a legal governmental entity or a rule adopted under a statute or ordinance."  Tex. Gov't Code § 554.001(1).  A violation of a law under the TWA includes "any disclosure of information regarding a public servant's employer tending to directly or circumstantially prove the substance of a violation of criminal or civil law, the State or Federal Constitution, statutes, administrative, rules or regulations."  *See Davis v. Ector Cnty., Tex.*, 40 F.3d 777 (5th Cir. 1994) (citing *Castaneda v. Tex. Dep't of Agric.*, 831 S.W.2d 501, 503 (Tex. App.–Corpus Christi 1992, writ denied)).

An employee makes a good faith report when he has both a subjective and an objectively reasonable belief that the reported conduct violates the law. *Rodriguez v. Bd. of Trs. of Laredo Indep. Sch. Dist.*, 143 F.Supp.2d 727, 738 (S.D. Tex. 2001).  The employee must actually believe

that he was reporting conduct that constituted a violation, and the belief must be reasonable in light of his or her training and experience. *City of Elsa v. Gonzalez*, 325 S.W.3d 622, 626 (Tex. 2010). The TWA defines an "appropriate law enforcement authority" as a governmental official or entity that "an employee in good faith believes is authorized to regulate under or enforce the law alleged to be violated in the report or to investigate or prosecute a violation of the criminal law." Tex. Gov't Code § 554.002(b); *Tharling*, 329 F.3d at 428. A plaintiff is required to show that "he honestly believed he was reporting the perceived violation to an authority within an entity which could regulate under or enforce the law in issue or investigate or prosecute a criminal offense and, moreover, that this belief was objectively reasonable." *Id.* at 428-29 (quoting *Duvall v. Tex. Dep't of Human Servs.*, 82 S.W.3d 474, 478 (Tex. App.–Austin, 2002, no pet.)).

Plaintiff proffers evidence showing that he was a public employee, employed by the City of Dallas, and that he in good faith reported the City's violations of the FCA and TMFPA to the federal government through the United States Attorney for the Northern District of Texas, and the State of Texas through the Texas Attorney General's Office, in a letter dated July 21, 2009. (Doc. 103 at 44-46.) He has therefore produced evidence sufficient to establish the first four elements of his retaliation claim.

### 2. **Retaliation**

The parties' dispute primarily focuses on the fifth element of the TWA claim. The fifth and final element of the whistleblower claim requires a plaintiff to show that the report was a but-for cause of the alleged adverse action. *See Guillaume v. City of Greenville*, 247 S.W.3d 457, 461-62 (Tex. App.–Dallas 2008, no pet.) Stated differently, the employee must show that his protected conduct was "such that, without it, the employer's prohibited conduct would not have occurred when

it did." *Tex. Dep't of Human Servs. of the State of Tex. v. Hinds*, 904 S.W.2d 629, 636 (Tex. 1994).

If the pertinent adverse personnel action is taken within ninety days of an employee's report, a

rebuttable presumption arises that the adverse personnel action was taken because of the employee's

report. *Faulkner v. Dep't of State Health Servs.*, 2009 WL 722983, at *4 (N.D. Tex. Mar. 19, 2009)

(citing Tex. Gov't Code § 554.004(a)).

Here, Plaintiff proffers evidence showing that he made the report to the federal and the state

government on July 21, 2009, and that the City fired him on December 2, 2009.  Since the City

terminated him more than 90 days after he made the report, no rebuttable presumption of retaliation

arises.  However, Plaintiff proffers evidence showing that the City fired him within 2 to 3 business

days of learning of the alleged protected activity.  While the City proffers a legitimate non-

retaliatory reasons for the adverse action, as discussed, all of the reasons it proffers are tied to

Plaintiff's filing of the *qui tam* suit.  Again, there are genuine issues of material fact that do not

entitle either party to summary judgment on the TWA claim.

## VII.  RECOMMENDATION

The motions for summary judgment should both be **DENIED**.

**SO RECOMMENDED** on this 27th day of September, 2011.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

20

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

21